In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 13-2160

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

PATRICK B. WALLACE,

*Defendant-Appellant*.

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:12-CR-30003-RM-BGC-1 — **Richard Mills**, *Judge*.

---

ARGUED APRIL 8, 2014 — DECIDED MAY 16, 2014

---

Before POSNER and TINDER, *Circuit Judges*, and LAW-
RENCE, *District Judge*.[*]

POSNER, *Circuit Judge*. The defendant was convicted by a
jury of possession of at least 280 grams of crack cocaine with
intent to distribute, and was sentenced to 288 months in
prison. His appeal challenges the conviction.

---

[*] Of the Southern District of Indiana, sitting by designation.

The defendant was a drug dealer. There was bad blood between him and his nephew Andrew Wallace, and Andrew, already a paid DEA informant, informed on the defendant to the agency. Agents fastened a tiny audio/video recorder on Andrew's shirt, searched him and his car to make sure he had no drugs, gave him $1250, and sent him to try to buy crack cocaine from his uncle. Watching the defendant's house from the street, the agents saw Andrew enter the house, leave between 10 and 20 minutes later, and get into his car. He drove to the local DEA office and handed over 22 grams of crack cocaine, which he said he'd bought with the $1250 in buy money that the agency had given him.

Agents watched the audio/visual recordings that had been made with the device that Andrew had worn. Although the recordings made inside the house were dark and blurry and did not exclude the possibility that he'd obtained the drugs not inside the house but from one (or perhaps both) of two men whom he'd been seen to encounter when leaving it, the agents decided they had sufficient grounds for thinking Andrew had obtained the drugs inside the house to justify applying for a search warrant. They applied and it was issued shortly after Andrew's arrival at the DEA office with the drugs. But before executing the warrant the agents had Andrew go back to the house to buy more crack with another $1250 that the agents gave him, and he returned with 18 more grams.

The search was then conducted by a team of DEA agents and local police, and large quantities of illegal drugs were seized. While the search was being conducted, the officer in charge of the occupants of the house (including the defendant), who had been herded into the front room of the

house, twice overheard the defendant tell one of the others "don't worry, everything in that room is mine." The officer told the lead agent what he had overheard, and the agent entered the room and asked the defendant "would you mind stepping out to talk about this?" According to the agent the defendant replied "I don't want to waste your time, everything in there's mine."

Later, but about six months before the trial, Andrew Wallace signed an affidavit, and recorded a video, swearing in both that he'd obtained the crack on his two visits to the defendant's house the night of the search not from the defendant but from someone he'd met outside the house, and also that he had lied when he had told the DEA, before the visits, that the defendant was a drug dealer. He had informed on the defendant, he said, out of spite, because the two had had a falling out.

Both the lead DEA agent on the case and the defendant's lawyer tried to get in touch with Andrew after reading his affidavit. This was difficult to do because he had left the state, expressing concerns for his safety that had led the DEA to give him $5000 to finance his move. The defense wanted to obtain testimony from him that might persuade the magistrate judge who had issued the warrant to search the defendant's house to exclude evidence discovered in the search from the trial.

Although he'd left the state, Andrew had gone only as far as St. Louis and was not in hiding. The government's lead investigator on the case spoke to him by phone, but when the investigator told him he'd be subpoenaed to testify at his uncle's trial, Andrew hung up; and he ignored the investigator's further attempts to speak to him. The defendant's law-

yer could have asked the magistrate judge who was conducting the pretrial proceedings in the case to issue a material-witness warrant commanding Andrew to attend the hearing, see 18 U.S.C. § 3144, but didn't. (The government could have asked for such a warrant as well, but had no incentive to do so, and did not.) In Andrew's absence the magistrate judge refused to suppress any evidence. Later, but before the trial began, the defendant's lawyer was able to reach Andrew in Minnesota and asked him to testify at the trial. Andrew promised he would, but failed to show up at the trial.

The lawyer wanted *faute de mieux* to play the videotape of Andrew's recantation at the trial. The government objected on grounds of hearsay, and the district judge sustained the objection. He was right to do so. The recantation on the videotape was inadmissible hearsay. It was an out-of-court statement offered for its truth and Andrew hadn't made the videotaped statement in circumstances, such as at a deposition or court hearing, in which he had been subject to cross-examination. Fed. R. Evid. 804(b)(1); see, e.g., *United States v. Sklena*, 692 F.3d 725, 731–33 (7th Cir. 2012); *Greiner v. Wells*, 417 F.3d 305, 325–26 (2d Cir. 2005).

At trial the government introduced into evidence part of the videotape of Andrew's second drug purchase, but without any sound. The lead DEA agent explained to the jury what he thought the videotape showed—plastic bags containing cocaine and the defendant's handing crack to Andrew while standing next to a microwave oven inside of which was a measuring cup containing an off-white substance that turned out to be crack-cocaine residue.

The defendant presents three grounds of appeal that have sufficient merit to warrant discussion. The first is that his statement to the lead DEA agent ("everything in there's mine") should not have been admitted at trial because the defendant hadn't received his *Miranda* warnings. The district judge refused to exclude the statement. He gave two reasons. The first was that it hadn't been made in response to a "custodial interrogation." That was a partial mistake. The statement was made in a custodial setting. The suspects in the front room, including the defendant, were in police custody; they were being overseen by a DEA agent and, the government concedes, were not free to leave the room. No matter; the judge's other reason for refusing to exclude the statement—that the agent wasn't asking the defendant to make a statement, incriminating or otherwise, and thus was not interrogating him—was correct. The agent was just asking the defendant whether he *wanted* to make a statement, to which the expected and proper answer would have been yes or no. Instead the defendant decided to blurt out an incriminating statement. That was not a statement elicited by an interrogation, or even responsive to the agent's question (which called for a yes or no answer, not a confession), and so there was no violation of the *Miranda* rule. *Rhode Island v. Innis*, 446 U.S. 291, 300–02 (1980). (We sometimes tell lawyers at oral argument: if a question by a judge can be answered "yes" or "no," answer it "yes" or "no." The defendant could have used such advice.)

Anyway the agent stationed in the front room had twice heard the defendant say "everything in that room is mine," an admission that the agent was free to and did testify to and to which the defendant does not and could not object. And the agent's having repeated the statement to the other

agent could not have spelled the difference between acquittal and conviction by a reasonable jury.

The defendant's second, and most interesting, ground of appeal is that showing the videotape of the second buy attempt to the jury, in the absence of Andrew Wallace, violated the defendant's constitutional right to confront the witnesses against him. Andrew as we know did not testify. He was a "witness" only in the sense that he wore a recording device that produced the depictions that the DEA agent interpreted as evidence that incriminated the defendant. Andrew didn't operate the device. Like the narrator of Christopher Isherwood's short story *A Berlin Diary*, Andrew could have said: "I am a camera with its shutter open, quite passive, recording, not thinking."

True, had he testified, he might have undermined the probative value of what the videotape showed or seemed to show (or was argued by the DEA agent to show), but he didn't testify. And remember that the defendant's lawyer could have asked the judge to compel Andrew to appear at the trial and testify, but didn't.

Pictures can convey incriminating information (think of the famous scene in *Blow-Up* in which David Hemmings's processing of a photo negative finally reveals the corpse). But one can't cross-examine a picture. The video of the defendant in this case handing crack to his nephew was a picture; it was not a witness who could be cross-examined. The agent narrated the video at trial, and his narration was a series of statements, so he was subject to being cross-examined and was, and thus was "confronted." Andrew could have testified to what he saw, but what could he have said about the recording device except that the agents had

strapped it on him and sent him into the house, where the device recorded whatever happened to be in front of it? Rule 801(a) of the Federal Rules of Evidence does define "statement" to include "nonverbal conduct," but only if the person whose conduct it was "intended it as an assertion." We can't fit the videotape to this definition.

The defendant had ample opportunity to challenge the reliability of the videotape, not only by cross-examining the agent who narrated it but also by finding an expert who might testify that the videotape had been doctored. But the videotape itself was not a "statement" the maker of which could be "confronted" to test the "statement's" accuracy.

So there was no confrontation-clause error. But if this is wrong, the error was harmless because of the overwhelming evidence of the defendant's guilt based on what the search turned up—drugs, some of the DEA buy money, and the defendant's wallet, all in a pair of jeans in his bedroom—and on the defendant's uncoerced admission in the front room to his possession of the contraband in the bedroom.

The third ground of the appeal is that the judge should not have denied the defendant's request to appoint new counsel for him. The ground of the request was that communication had broken down between the defendant and his existing counsel. That means, the defendant's current counsel argues, that the denial of the request for new counsel was equivalent to denial of the constitutional right to assistance of counsel in a criminal case. That is wrong: "the right to counsel *of choice* does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006) (emphasis added); see also *Wheat v. United States*, 486 U.S. 153, 159 (1988); *Mor-*

*ris v. Slappy*, 461 U.S. 1, 14 (1983). If communication with the defendant's counsel broke down as a result of neglect or ineptitude by counsel, the defendant may have a claim of ineffective assistance of counsel, but to prove that he would have to present evidence. For "if a defendant is still afforded adequate representation, an erroneous denial of a motion for substitution is not prejudicial and is therefore harmless." *United States v. Harris*, 394 F.3d 543, 552 (7th Cir. 2005); see also *United States v. Volpentesta*, 727 F.3d 666, 672–73 (7th Cir. 2013). But see *United States v. Smith*, 640 F.3d 580, 590 (4th Cir. 2011); *Daniels v. Woodford,* 428 F.3d 1181, 1198–2000 (9th Cir. 2005)—cases that support the defendant's position in this case but are contrary to our decisions, cited above.

The defendant's present counsel has *two* ineffective-assistance claims, however—the one just described, which she wants us to decide on the present record, and a separate claim that she wants to reserve for a possible section 2255 proceeding. That claim is based on trial counsel's failure to seek a material-witness warrant, which the magistrate judge indicated he would have granted, to bring Andrew Wallace to court to testify at the trial. Andrew, however, was such a loose cannon that the lawyer would have been taking a grave risk in dragging him into court against his will. Maybe in anger Andrew would have recanted his recantation. If not, he might well have disintegrated under cross-examination. He probably would not have been a credible witness. But maybe in a section 2255 proceeding new counsel could present convincing evidence that the trial lawyer had made a grave mistake by failing to seek such a warrant.

It is procedurally inefficient to allow a claim of ineffective assistance to be split into two parts, one to be litigated on di-

rect appeal, the other in a collateral attack on the conviction, at least if the two components are likely to overlap—in this case, for example, the breakdown of communication might have been a factor in the trial counsel's failure to seek a material-witness warrant.

To claim ineffective assistance of trial counsel on direct appeal from his client's conviction and sentence is risky. Rejection of the claim bars the defendant from mounting a collateral attack on his conviction under 28 U.S.C. § 2255 grounded in a denial of his constitutional right to effective assistance of counsel, *United States v. Flores*, 739 F.3d 337, 340–42 (7th Cir. 2014); *Peoples v. United States*, 403 F.3d 844, 847–48 (7th Cir. 2005*)*; *Fuller v. United States*, 398 F.3d 644, 649 (7th Cir. 2005), at least if it's the same claim; see *Yick Man Mui v. United States*, 614 F.3d 50, 55–57 (2d Cir. 2010). "We have said many times that it is imprudent to present an ineffective-assistance argument on direct appeal." *United States v. Flores*, *supra*, 739 F.3d at 341. By pleading ineffective assistance on appeal, where evidence usually can't be presented, counsel forfeits the opportunity to obtain evidence (as by questioning trial counsel) that might bolster his claim.

The concern we've just expressed was raised at oral argument, and fearing that we would reject the dual claim of ineffective assistance for want of evidence (for no evidence had been presented either that the breakdown in communication was trial counsel's fault or that he should have sought a material-witness warrant), the defendant's present counsel asked us to permit him to reserve the second claim for a possible section 2255 proceeding but to decide the first claim; or alternatively, if we insisted on deciding both, to permit him to withdraw both claims.

We reject such piecemeal litigation. But lest our declaring the claim of ineffective assistance of counsel forfeited precipitate a section 2255 proceeding charging the defendant's *present* counsel with ineffective assistance, we hereby dismiss both claims without prejudice, while affirming the judgment.